## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

SHARESTATES INVESTMENTS,
LLC,                     *
                               *

    *Plaintiff*,                 *

    v.                         *           Civil Case No: 1:23-CV-01416-JMC

WFG NATIONAL TITLE
INSURANCE CO.,
                               *

    *Defendant.*

*    *    *    *    *    *    *    *    *    *    *    *

## <u>MEMORANDUM OPINION</u>

Plaintiff, Sharestates Investments, LLC ("Sharestates"), filed the present action for breach of contract and breach of the duty of good faith and fair dealing on May 26, 2023, against Defendant, WFG Title Insurance Co. ("WFG"). (ECF No. 1). Presently before the Court are three motions: (1) Plaintiff's Re-Filed Motion for Summary Judgment (ECF No. 19),[1] Defendant's Motion to Strike (ECF No. 22), and Defendant's Motion to Dismiss (ECF No. 23). The Court has considered the motions as well as the parties' respective oppositions and replies thereto. No hearing is necessary pursuant to Loc. R. 105.6 (D. Md. 2023). For the reasons explained below, the Motion for Summary Judgment will be granted in part and denied in part; the Motion to Strike will be granted in part and denied in part, and the Motion to Dismiss will be granted in part and denied in part.

---

[1] Plaintiff initially filed its motion for summary judgment simultaneously with its complaint. The Court struck the motion as premature given the undersigned's Case Management Order before all parties consented to proceed before the undersigned on June 28, 2023. *See* (ECF Nos. 2, 4, 18). After the parties filed their consents, Plaintiff then re-filed its motion for summary judgment shortly thereafter. (ECF No. 19).

I.      **BACKGROUND**

Plaintiff is a mortgage lender who purchased a lender's title insurance policy from Defendant regarding Plaintiff's interest in a West Baltimore property known as 327 N. Eutaw Street (the "Property").  (ECF No. 1 at 2; ECF No. 22-1 at 2).[2] Plaintiff issued the mortgage to N&A Kitchen, LLC, a business purportedly operated by Jean Agbodjogbe.  (ECF No. 1 at 2). Unbeknownst to Plaintiff, Agbodjogbe "was a con-man" who defrauded another individual, Ms. Alia Al-Sabah, who paid Agbodjogbe to purchase and renovate various properties, including the Property.  *Id.* at 3–4.  In Al-Sabah's previous lawsuit against Agbodjogbe in this Court, the Court found that

> Al-Sabah produced evidence demonstrating that between September, 2014, and April, 2016, Al-Sabah wired Agbodjogbe over $7.8 million for, what she believed, would be the purpose of purchasing, and renovating, several properties located in Baltimore City, Maryland, and New York, New York.  While Agbodjogbe told Al-Sabah that she would own each property, unbeknownst to Al-Sabah, Agbodjogbe actually purchased each property through corporate entities that Agbodjogbe established in his name alone.

*Al-Sabah v. Agbodjogbe*, No. CV SAG-17-730, 2020 WL 1063003, at *1 (D. Md. Mar. 4, 2020) (internal citations omitted).

Al-Sabah then filed a second lawsuit in this Court in September 2018, alleging that various entities—including Plaintiff—conspired to obtain fraudulent mortgages regarding the subject properties and aided and abetted Agbodjogbe's fraudulent conduct.  *See Al-Sabah v. World Bus.*

---

[2] When the Court cites to a particular page number or range, the Court is referring to the page numbers located in the electronic filing stamps provided at the top of each electronically filed document.  At the motion to dismiss stage, the Court "accept[s] as true all well-pleaded facts and construe[s] them in the light most favorable to the plaintiff." *Harvey v. Cable News Network, Inc.*, 48 F.4th 257, 268 (4th Cir. 2022).

*Lenders, LLC*, No. 18-cv-02958-SAG, ECF No. 1.  Plaintiff provided Defendant with notice of the second lawsuit in October 2018 and demanded a defense.  (ECF No. 1 at 4).  Defendant responded to the demand by letter dated October 22, 2018, in which Defendant asserted various grounds supporting its refusal to defend Plaintiff.  (ECF No. 1-5).  After further unsuccessful efforts to obtain Defendant's aid in defending Plaintiff against Al-Sabah's second lawsuit, the current lawsuit ensued in which Plaintiff claims that (1) Defendant breached the terms of its insurance contract in failing to defend Plaintiff and/or pay its defense fees and costs arising from Al-Sabah's second lawsuit; and (2) Defendant violated the duty of good faith and fair dealing implied within the insurance contract by denying coverage for Al-Sabah's second lawsuit and corresponding *lis pendens* against the Property.  (ECF No. 1).  The present motions then ensued, each of which is discussed in turn below.

## II.    STANDARD OF REVIEW

### A.  Motion to Strike

Federal Rule of Civil Procedure 12(f) permits a court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f).  Motions to strike under Rule 12(f) "are disfavored and 'should be denied unless the allegations have no possible relation to the controversy and may cause prejudice to one of the parties.'" *Burgess v. Balt. Police Dep't,* No. CV RDB-15-0834, 2022 WL 4465875, at *1 (D. Md. Sept. 26, 2022) (quoting *Schultz v. Braga*, 290 F. Supp. 2d 637, 654–44 (D. Md. 2003)). "Nevertheless, motions to strike will be granted when the movant meets its burden of proving that the challenged material is immaterial and prejudicial." *Fitchett v. Spartech, LLC*, 634 F. Supp. 3d 241, 243 (D. Md. 2022).  Of particular relevance for purposes of the Motion to Strike, courts in the Fourth Circuit have concluded that factual allegations within a plaintiff's complaint may be

properly considered immaterial and prejudicial where they allege evidence of settlement negotiations in violation of Federal Rule of Evidence 408. *See, e.g.*, *Anderson v. United States*, No. CIV. CCB-08-3, 2009 WL 890094, at *1 n.1 (D. Md. Mar. 26, 2009) (granting motion to strike "plaintiff's references to the parties' settlement discussions" "In accordance with Federal Rule of Evidence 408, which makes inadmissible certain evidence pertaining to settlement negotiations"); *Ciolli v. Iravani*, 625 F. Supp. 2d 276, 289 (E.D. Pa. 2009); Fed. R. Evid. 408 (prohibiting the admission into evidence of conduct or statements made during compromise negotiations about a claim either to prove or disprove the validity or amount of a disputed claim or to impeach a party by a prior inconsistent statement or contradiction). A district court's adjudication of a motion to strike is reviewed for abuse of discretion. *Braxton v. Jackson*, 782 F. App'x 240, 244 (4th Cir. 2019).

B. <u>Motion to Dismiss</u>

The purpose of Federal Rule of Civil Procedure 12(b)(6) "is to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006) (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999)) (internal quotations omitted). To survive a Rule 12(b)(6) motion to dismiss, "detailed factual allegations are not required, but a plaintiff must provide the grounds of his entitlement to relief," which requires "more than labels and conclusions, or a formulaic recitation of the elements of a cause of action." *Petry v. Wells Fargo Bank, N.A.*, 597 F. Supp. 2d 558, 561–62 (D. Md. 2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545 (2007)) (internal quotations omitted). In considering a motion to dismiss, "the Court must accept the complaint's allegations as true, and must liberally construe the complaint as a whole." *Humphrey v. Nat'l Flood Ins. Program*, 885 F.Supp. 133, 136

4

(D. Md. 1995) (internal citations omitted).  The Court must also construe the facts and reasonable inferences from the facts in the light most favorable to the plaintiff.  *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997); *see also Petry*, 597 F. Supp. 2d at 562 ("Once a claim has been stated adequately . . . it may be supported by showing any set of facts consistent with the allegations in the complaint.") (quoting *Twombly*, 550 U.S. at 546).

### C.  Motion for Summary Judgment

Federal Rule of Civil Procedure 56(a) requires the Court to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  A dispute as to a material fact "is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *J.E. Dunn Const. Co. v. S.R.P. Dev. Ltd. P'ship*, 115 F. Supp. 3d 593, 600 (D. Md. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A nonmoving party "opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'"  *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting Fed. R. Civ. P. 56(e)).

The Court is "required to view the facts and draw reasonable inferences in the light most favorable to" the nonmoving party.  *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008) (citing *Scott v. Harris*, 550 U.S. 372, 377 (2007)).  However, the Court must also "abide by the 'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'"  *Heckman v. Ryder Truck Rental, Inc.*, 962 F. Supp. 2d 792, 799–800 (D. Md. 2013) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993)).  Consequently, a party cannot

5

create a genuine dispute of material fact through mere speculation or compilation of inferences. *See Deans v. CSX Transp., Inc.*, 152 F.3d 326, 330–31 (4th Cir. 1998).

## III.   DISCUSSION

### A.   Defendant's Motion to Strike

In addition to the above facts, Plaintiff includes various allegations in its Complaint that Defendant partially accepted its duty to defend Plaintiff through various letters between the parties in which they dispute the applicability of the operative title insurance policy.  Defendant argues that any such allegations and corresponding exhibits should be stricken from the Complaint because they contain statements "relating to, or referencing the existence of, settlement negotiations in violation of FRE 408."  (ECF No. 22-1 at 1).  Defendant relies on a Tolling and Standstill Agreement ("Agreement") entered into by both parties, effective October 5, 2021, which provides, in relevant part:

> The Parties agree that any discussions among them during the Tolling Period [October 5, 2021, to thirty (30) days following written notice by one party to the other of their intent to terminate the agreement] shall be covered by Federal Rule of Evidence 408, Maryland Rule 5-408, and any similar rules in any appropriate venue which states that any conduct or statements made during such discussions shall not be admissible, on behalf of any party, either to prove or disprove the validity of a disputed claim or to impeach by a prior inconsistent statement or contradiction.

(ECF No. 22-2).  Accordingly, Defendant argues that certain portions of Plaintiff's Complaint should be stricken because they rely "on settlement negotiations, communications, and information contained in correspondence that occurred during the Tolling Period."  (ECF No. 22-1 at 2). Defendant is partially correct.

As this Court has previously recognized, granting a motion to strike a plaintiff's references to the parties' settlement discussions is appropriate where a plaintiff offers those discussions in violation of Federal Rule of Evidence 408.  *Anderson*, 2009 WL 890094 at *1 n.1.  The Fourth

Circuit Court of Appeals has held similarly. *See Renaissance Greeting Cards, Inc. v. Dollar Tree Stores, Inc.*, 227 F. App'x 239, 246–47 (4th Cir. 2007) (affirming district court's grant of a motion to strike paragraphs in a complaint that "detailed certain communications between the parties' attorneys made during settlement negotiations"). This Court even analyzed a similar situation in *United States v. Hartford Accident and Indemnity Co.* when Chief Judge Bredar granted a motion to strike evidence of specific conduct set forth by a plaintiff during settlement negotiations regarding liability in an insurance dispute. No. CV JKB-14-2148, 2016 WL 386218, at \*3–4 (D. Md. Feb. 2, 2016). Although the facts of that case are not identical to those *sub judice*, Judge Bredar noted the general principal that evidence of settlement negotiations used for the purpose of proving the validity of a disputed claim is inadmissible under FRE 408, improper for this Court to consider in analyzing a motion for summary judgment, and grounds to strike such evidence. *Id.* Our sister courts in the Fourth Circuit and elsewhere have held similarly in the specific context of striking details of settlement negotiations from complaints. *See, e.g.*, *Phila. Church of Our Savior v. Concord Twp.*, No. CIV.A. 03-1766, 2004 WL 1824356, at \*2 (E.D. Pa. July 27, 2004) ("While Rule 408 does not apply to pleadings directly, repeated decisions from this Court have held that allegations in a complaint may be stricken, under Rule 12(f), as violative of [Rule 408] . . . Therefore, because claims in a complaint may be stricken under Rule 12(f) if they violate Rule 408, they may also be found futile pursuant to Rule 408."); *Ciolli*, 625 F. Supp. 2d at 289; *U.S. ex rel. Alasker v. CentraCare Health Sys, Inc.,* No. 99-106, 2002 WL 1285089, at \*2 (D. Minn. June 5, 2002); *My Mavens, LLC v. Grubhub, Inc.,* No. 20 CIV. 4657 (PGG), 2023 WL 5237519, at \*15 (S.D.N.Y. Aug. 14, 2023) ("The Second Circuit has not addressed the issue of how Rules 408 and 12(f) intersect. District courts in this Circuit have, however, consistently granted motions to strike portions of complaints that refer to settlement offers or statements made in the course of settlement

negotiations, particularly where the statements are described as such."); *Columbia Sportswear Co. v. Ferreira*, No. 3:23-CV-00594-HZ, 2023 WL 5928528, at *5 (D. Or. Sept. 12, 2023) (noting when courts "have granted motions to strike settlement communications at the pleading stage" and citing to cases in which courts did so).

With these principles in mind, Defendant contends that factual allegations 18–50, 52–55, and 58–59; Count I allegations 60 and 66–68; Count II allegations 69 and 73–77; and exhibits 4– 6 and 8 should be stricken.  (ECF No. 22 at 3).  Plaintiff responds that none of the above items are settlement or compromise offers, and therefore should not be stricken, primarily because (1) "none of the communications are marked as settlement communications"; (2) some of the items reference a "coverage position letter or reservation of rights letter, not a settlement or compromise offer"; and Plaintiff provides a chart with responses to each specific item Defendant takes issue with, mostly by asserting those same arguments.  (ECF No. 27-1).  Interestingly, Plaintiff's chart includes various rhetorical questions to the Court, asking the *Court* to furnish reasons as to why certain allegations should not be stricken.  With regard to those responses specifically, the Court declines Plaintiff's invitation to undertake a burden that is not the Court's.  Regardless, the Court finds that certain items and exhibits should be stricken, while others should not.

a. Paragraphs 18 through 24

Paragraphs 18 through 24, for the most part, will not be stricken.  Those items regard Plaintiff's initial letter to Defendant asserting that Defendant was obligated to defend Plaintiff and the contents of Defendant's letter in response.  Defendant's letter refusing Plaintiff's demand was dated October 22, 2018, well before the Agreement took effect.  Defendant's argument that the contents of the letter are settlement negotiations is thus unpersuasive, especially considering that Defendant only moved to strike exhibits 4, 5, 6, and 8 from the Complaint rather than exhibit 2—

Defendant's October 22, 2018, letter.  However, Plaintiff does allege in paragraph 20(b) that the position taken in Defendant's October 2018 letter was without basis because Defendant admitted to partially accepting the defense in *November 2021*.  Therefore, paragraph 20(b) both falls within the scope of the Agreement and seemingly aims to prove the validity of Plaintiff's claim by arguing that a communication occurring during the Agreement's period indicates Defendant's concession to defend Plaintiff during Al-Sabah's second lawsuit.  As such, paragraph 20(b) will be stricken, but paragraphs 18–24 will otherwise remain.

      b.  <u>Paragraphs 25 through 50 and Exhibits 4, 5, and 6</u>

The allegations in paragraphs 25–50, along with exhibits 4–6, detail specific statements made by the parties within the Agreement's gambit related to settlement discussions.  For instance, paragraphs 25 through 35 reference the specific contents of exhibit 4, in which Plaintiff alleges that Defendant "acknowledged [Defendant's] defense obligation."  (ECF No. 1 at 6).  Exhibit 4 is a November 20, 2021, letter from Defendant to Plaintiff "in response to the request [Plaintiff made] . . . to provide indemnity and defense."  (ECF No. 1-7 at 2).  Plaintiff's repeated assertions in those paragraphs and that exhibit 4 demonstrates Defendant conceding that it must defend Plaintiff for Al-Sabah's second lawsuit seems plainly to be an attempt by Plaintiff to use communications that occurred during the parties' mutually entered into Agreement to support that Plaintiff has a viable claim to require Defendant to provide such a defense.  In other words, Plaintiff's reliance on those paragraphs and exhibit 4 seems violative of FRE 408.  There are several other instances in the record buttressing this conclusion.  First, Plaintiff's letter which Defendant responded to on November 20, 2021, via exhibit 4 expressly asks Defendant to reconsider its refusal to defend Plaintiff because, in part, "*it would be unfortunate if we need to proceed down the litigation road*," evidencing *Plaintiff*'s own intent to enter into settlement discussions with Defendant instead of

seeking Court intervention.  (ECF No. 27-1 at 7; ECF No. 1-6 at 9) (emphasis added).  Second, Defendant's November 20, 2021, letter (exhibit 4) was written within the time frame covered by the Agreement, thereby making it improper to use the letter to demonstrate the viability of Plaintiff's claim.  And third, Defendant's subsequent November 29, 2021, letter—exhibit 6— expressly provides:

> My [Defense counsel's] communication with you [Plaintiff's counsel] is *undertaken in the context of settlement discussions and to explore whether common ground would benefit both of our clients* . . . It appears that the last sentence of the penultimate paragraph of my November 10, 2021 letter may be the cause of your concern. *The sentence is nothing more than an invitation to express any additional issues* your client may have arising out of this evaluation.

(ECF No. 28 at 5; ECF No. 1-9 at 4) (emphasis added).  This November 29, 2021, letter (exhibit 6) was in response to Plaintiff's November 17, 2021, letter (exhibit 5), in which Plaintiff disputes Defendant's stance regarding its obligation to defend Plaintiff.  It also occurred during the Agreement's scope.

Plaintiff's arguments against striking these items are unpersuasive.  Although Plaintiff argues that the above items are proper because they do not contain a "settlement offer in any way," they nevertheless contain settlement communications.  *See Fiberglass Insulators, Inc. v. Dupuy*, 856 F.2d 652, 654 (4th Cir. 1988) ("Federal Rule of Evidence 408 is broader than the common law exclusionary rule in many jurisdictions and excludes from evidence *all statements made in the course of settlement negotiations*.") (emphasis added); *see also Columbia Gas Transmission, LLC v. Haas*, 409 F. Supp. 3d 420, 435 (D. Md. 2019), *aff'd*, 837 F. App'x 155 (4th Cir. 2020) ("Thus, offers to settle, or statements made alongside offers to settle, are excluded even if no settlement negotiations follow or if the party to whom the offer is made refuses to engage in compromise negotiations.") (internal quotation omitted).  Plaintiff's broader argument that "none of the communications are marked as settlement communications" is also unconvincing given that some

of them are, in fact, expressly stated to be in the course of settlement discussions like exhibit 6. But even if they weren't, Plaintiff cannot turn a blind eye to the fact that it voluntarily entered into the Agreement, which does provide that all communications during the relevant time period are for the purpose of settlement communications within the scope of Rule 408 and its applicable counterparts.   Finally, the Court rejects at this juncture that "[Defendant's] letters, even if construed as settlement communications . . . *would* properly be admissible to establish the inadequacy of [Defendant's] 2018 investigation and the improper delay in [Defendant's] payment of defense costs, among other things."  (ECF No. 27-1 at 13) (emphasis added).  Without needing to rule on the substance of that statement, the plain language of the contested factual allegations in Plaintiff's Complaint does not support such a use of Defendant's letters at this point in time. Rather, Plaintiff's Complaint consistently references these letters to argue that Defendant conceded its obligation to defend Plaintiff and in doing so Plaintiff relies on these communications to prove the validity of its claims and eventually in support of its Motion for Summary Judgment. Should Plaintiff wish to use these letters for a permissible purpose as the case nears closer to trial, Plaintiff should feel free to attempt to do so.  But for now, items 25 through 47 and exhibits 4, 5, and 6 of Plaintiff's Complaint will be stricken.

Items 47 through 50 will not be stricken, though, because they do not purport to use the contents of any settlement communications to prove the validity of Plaintiff's claim.  Rather, these paragraphs argue that Defendant's position that it was not obligated to defend Plaintiff because the underlying lawsuits had no impact on the Property's title is without merit without relying on any potential concessions made by Defendant through the parties' letter exchanges.  They detail the facts that Defendant refused to provide a defense, this Court's prior ruling in Al-Sabah's second

lawsuit, and Plaintiff's alleged damages incurred from defending Al-Sabah's second lawsuit.  As such, paragraphs 47 through 50 will not be stricken.

        c.   <u>Paragraphs 52 through 55, 58 through 59, and Exhibit 8</u>

Paragraphs 52 through 55 and 58 through 59 of Plaintiff's Complaint reference exhibit 8. Exhibit 8 is a letter from Defense counsel dated March 20, 2023, in which Defendant asserts that its prior decisions regarding its coverage position remained unchanged, but also provides that Defendant will pay $18,327.75 for Plaintiff's losses during the period that Defendant allegedly acknowledged it had an obligation to defend Plaintiff.  (ECF No. 1-11).  The Court finds that exhibit 8 and the $18,327.75 tender therein constitute a settlement offer for which Plaintiff may not rely on in proving the validity of its claim, and exhibit 8 will be stricken at this time.  Not only did the communication occur within the Agreement's scope, but the contents of exhibit 8 indicate that the $18,327.75 tender was made in accordance with Defendant's previous coverage determination.  In other words, the $18,327.75 was an offer to compensate Plaintiff based on Defendant's alleged concessions during the parties' settlement discussions that Defendant was, in fact, obligated to defend Plaintiff at least partially.  But the above paragraphs do not all necessarily rely on exhibit 8 to prove the validity of Plaintiff's claims.  For instance, paragraphs 52 through 55 merely allege that the *lis pendens* had not been removed and detail the process by which Plaintiff calculated its alleged losses.  As such, those paragraphs will not be stricken.  Finally, paragraph 58 will be stricken but not paragraph 59.  Paragraph 58 amounts to asserting that Defendant conceded—through the settlement discussions via the letters under the Agreement—it was obligated to defend Plaintiff and thus is improper.  But paragraph 59 merely sets forth an alleged amount of damages resulting from Defendant's refusal to defend Plaintiff as requested.

12

Accordingly, the Court will strike exhibit 8 and paragraph 58 from Plaintiff's Complaint but will not strike paragraphs 52 through 55 or 59.

> d.  Count I paragraphs 60 and 66 through 68

The Court will not strike paragraphs 60 and 66 through 68 of Plaintiff's Complaint.  These paragraphs broadly allege that Defendant failed to abide by the terms of the insurance contract and assert that Plaintiff incurred losses/damages as a result.  As these paragraphs do not impermissibly rely on or assert purported concessions made by Defendant throughout the parties' settlement communications, they will remain.[3]

**B.  Defendant's Motion to Dismiss**

Couched within Defendant's Opposition to Plaintiff's Motion for Summary Judgment is an argument that Plaintiff's Complaint should be dismissed for failure to state a claim under Rule 12(b)(6).  With regard to Count I—breach of contract—Defendant asserts that "On its face, the Complaint fails to state a viable claim against [Defendant] because Plaintiff has failed to allege any actual loss suffered by Plaintiff that would require coverage under the policy."  (ECF No. 23-1 at 23).  Defendant's argument is unpersuasive.

"Under Maryland law, the elements of a breach of contract claim include: (1) a contractual obligation and (2) a material breach of that obligation."  *GMD Props., LLC v. Safeco Ins. Co. of*

---

[3] Because the court will dismiss Count II of Plaintiff's Complaint for the reasons that follow, the Court need not analyze whether the items alleged under Count II of Plaintiff's Complaint should be stricken.  Further, the Court notes that its rulings regarding the Motion to Strike aim to provide the most appropriate avenue for Plaintiff to pursue its case without encroaching on applicable procedural and evidentiary rules.  Plaintiff's cause of action asserts that Defendant failed to live up to the terms of the parties' insurance contract.  In adjudicating the merits of Plaintiff's claims, the Court places higher priority on the contract itself and its potential application rather than purported concessions made by Defendant during the course of settlement discussions.  Put simply, Plaintiff's cause of action for breach of contract could be pled without any reference to the Defendant's letters whatsoever, as the language of the insurance contract and Al-Sabah's second lawsuit carry more weight as to what exactly the contract covers and what it does not.  *See Walk v. Hartford Cas. Ins. Co.*, 382 Md. 1, 15–17 (2004).  Plaintiff recognizes as much in its reply to Defendant's opposition to the Motion for Summary judgment.  *See* (ECF No. 26-1 at 9).  Thus, the Court's above rulings seek to strike a balance between permitting Plaintiff to pursue its claims with sufficient detail while respecting the importance of and necessity to encourage frank settlement discussions between litigants.

*Am.*, No. 21-CV-02394-LKG, 2022 WL 2073854, at *3 (D. Md. June 9, 2022).[4]  Thus, "plaintiffs must plead that there existed a 'contractual obligation, breach, and damages' to state a plausible breach of contract claim."  *Id.* (quoting *Class Produce Grp., LLC v. Harleysville Worcester Ins. Co.*, No 16-3431, 2018 WL 1471682, at *8 (D. Md. Mar. 23, 2018)).  Maryland courts construe insurance contracts, like other contracts, "according to the terms which the parties have used, to be taken and understood, in the absence of ambiguity, in their plain, ordinary, and popular sense."  *Bergholm v. Peoria Life Ins. Co. of Peoria, Ill.*, 284 U.S. 489, 492 (1932); *see also Cole v. State Farm Mut. Ins. Co.*, 359 Md. 298, 305 (2000) ("Our primary task in interpreting an insurance policy, as with any contract, is to apply the terms of the contract itself.").

Here, Plaintiff has plausibly alleged an action for breach of contract such that Count I will not be dismissed.  The parties do not dispute that there is a valid contract between them, and that there exists therein a contractual obligation for Defendant to defend Plaintiff for losses covered under the contract.  Although Defendant contests whether Plaintiff has suffered losses covered under the contract, Defendant's argument speaks more to the merits of Plaintiff's claim rather than whether Plaintiff has plausibly *alleged* a breach of the parties' contract.  Plaintiff clearly alleges in its Complaint that (1) Defendant had a contractual obligation to defend and indemnify Plaintiff in litigation in which any third party asserted a claim covered by the parties' contract; (2) that Defendant breached that contractual obligation by failing to defend Plaintiff in Al-Sabah's second lawsuit and the *lis pendens*; and (3) that Plaintiff suffered damages as a result.  Accordingly, Count I of Plaintiff's Complaint will not be dismissed.

---

[4] "Federal courts sitting in diversity apply the conflict of law rules prevailing in the states in which they sit." *Havtech, LLC v. AAON Inc.*, No. SAG-22-00453, 2022 WL 1213476, at *4 (D. Md. Apr. 25, 2022).  The Court recognizes that Maryland substantive law applies to the disputes in this case and neither party argues to the contrary.

Turning to Count II—breach of the implied covenant of good faith and fair dealing—Defendant argues that Count II should be dismissed because Maryland does not recognize an independent cause of action for implied covenant of good faith and fair dealing.  (ECF No. 23-1 at 30).  Maryland courts have consistently held that Defendant is correct.  *See, e.g.*, *Mount Vernon Props., LLC v. Branch Banking and Tr. Co.*, 170 Md. App. 457, 471 (2006) ("[W]e affirm the circuit court's holding that there is no independent cause of action at law in Maryland for breach of the implied covenant of good faith and fair dealing."); *Kaye v. Wilson-Gaskins*, 227 Md. App. 660, 675 n.7 (2016) ("Maryland does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing."); *Magnetti v. Univ. of Md.*, 171 Md. App. 279, 285 n.3 (2006), *aff'd*, 402 Md. 548 (2007) ("As an aside, we note that Maryland does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing; the allegations making up such a claim should be pursued under a plaintiff's breach of contract claim.").  Plaintiff's argument that Count II seeks *tort* damages instead of contract damages is of no aid.  *See Johnson v. Federal Kemper Ins. Co.*, 74 Md. App. 243, 248 (1988) ("[M]aryland does not recognize a specific tort action against an insurer for bad faith failure to pay an insurance claim."); *Hartz v. Liberty Mut. Ins. Co.*, 269 F.3d 474, 476 (4th Cir. 2001); *Jones v. Hyatt Ins. Agency, Inc.*, 356 Md. 639, 655 (1999) ("Under Maryland law, an insurer who mistakenly denies coverage does not breach a tort duty owed either to the insured or to third-party claimants . . . Instead, the duty owed . . . is entirely contractual."); *Chimes Int'l, Ltd. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, No. CV L-10-773, 2010 WL 11691950, at *2 (D. Md. June 3, 2010) ("When a dispute arises over the existence of a valid contractual obligation or where the defendant has failed to recognize or undertake any contractual obligation whatsoever, the plaintiff is ordinarily limited to a breach of contract remedy.  The sole exception to this limitation arises when a liability insurer

actually undertakes the defense of its insured but fails to defend in good faith.  In that event, the plaintiff may bring a suit in tort.").[5]   Accordingly, Count II of Plaintiff's Complaint will be dismissed.

### C.  Plaintiff's Motion for Summary Judgment

Plaintiff argues in its Motion for Summary Judgment that it is entitled to judgment as a matter of law that Defendant breached its duty to defend.[6]  This Court has previously summarized the purpose and scope of a title insurer's duty to defend:

> Title insurance protects property holders against loss or damage resulting from defects or unmarketability in the title of the property held by the insured.  Title insurance can also serve as litigation insurance . . . to the extent that the policy requires the insurer to defend the policy holder from attacks by third parties against the insured title.  An insurer's duty to defend is broader than its duty to indemnify.  But the duty to defend is not limitless: a title insurer's duty to defend depends on (1) the scope of the policy's coverage and (2) whether the allegations in the underlying lawsuit bring the claim within this coverage.

*Back Creek Partners, LLC v. First Am. Title Ins. Co.*, 213 Md. App. 703, 712 (2013) (internal quotations and citations omitted).  Thus, the Court determines whether Defendant had a duty to defend by examining the scope of coverage of the parties' insurance contract and whether Al-

---

[5] Plaintiff relies on *Mesmer v. Maryland Automobile Insurance Fund* for the proposition that "The tort action based upon a liability insurer's bad faith failure to settle a claim within policy limits can arise only if the insurer undertakes to provide a defense against the claim."  (ECF No. 24-1 at 12) (quoting 353 Md. 241, 263 (1999)).  However, *Mesmer*'s holding, as Plaintiff's citation highlights, was in the context of "a bad faith failure to settle a liability claim within policy limits," and that court further opined that "A liability insurer's mistaken refusal to provide any defense whatsoever, on the grounds that there is no valid insurance contract or that there is no coverage under an insurance contract, *gives rise to a breach of contract action against the insurer.  It does not give rise to the tort action* . . . ."  353 Md. at 252 (emphasis added).  This conclusion is bolstered by Plaintiff's own argument.  For instance, Plaintiff sets forth case law indicating that the duty of good faith and fair dealing applies to all contracts in Maryland, which supports the notion that a breach of that duty gives rise to a breach of contract rather than providing an avenue for a separate tort action.  *See* (ECF No. 24-1 at 9).  Plaintiff's reliance on *State Farm Mutual Auto Insurance Co. v. White*, 248 Md. 324 (1967), is similarly misplaced, as this Court has previously distinguished that that case pertains to "claims for wrongful failure to settle within policy limits" rather than "where an insurer refused to defend a claim from the outset."  *Dickson v. Selected Risks Ins. Co.*, 666 F. Supp. 80, 81 (D. Md. 1987).

[6] The Court notes at the outset that it will not consider the previously stricken evidence or allegations within the Complaint in reaching its conclusions regarding the Motion for Summary Judgment.  *See Hartford Accident and Indemnity Co.*, 2016 WL 386218 at *2.

Sabah's second lawsuit fell within this scope of coverage. *Id.* In doing so, this Court is guided by the Fourth Circuit's explanation of the duty to defend under Maryland law and, importantly for purposes of this motion, the distinction between an insurer's duty to defend and an insurer's duty to indemnify:

> In Maryland, it is axiomatic that the duty to defend is broader than the duty to indemnify. These obligations are conceptually distinct, and are triggered by different circumstances. The duty to defend refers to an insurer's obligation to defend its insured when a third party files suit. This duty arises at the outset of litigation against the insured, whenever the underlying complaint and other appropriate extrinsic evidence reveal claims that are even potentially covered under the insurance policy. In order for an insurer to be obligated to defend an insured, the underlying tort suit need only *allege* action that is *potentially covered* by the policy, no matter how attenuated, frivolous, or illogical that allegation may be. Doubts as to potential liability are resolved against the insurer. And in most circumstances, if any claims potentially come within the policy coverage, the insurer is obligated to defend all claims, notwithstanding alternative allegations outside the policy's coverage.
>
> The duty to indemnify, by contrast, refers to an insurer's responsibility to pay a monetary award when its insured has become liable for a covered claim. [T]he duty to indemnify depends upon liability, i.e., an insurer's obligation to pay a judgment or settlement. This duty is thus narrower than the duty to defend. While an insurer must frequently defend both potentially covered claims and claims that are not covered under its policy, it is only required to indemnify covered claims for which liability is incurred.
>
> Thus, a major distinction between the duties to defend and indemnify is that the duty to defend depends only upon the facts as alleged, and the duty to indemnify depends upon liability. For this reason, courts applying Maryland law may conclude that an insurer has a duty to defend, but commonly withhold judgment on the scope of the duty to indemnify until the insured is found liable and the basis of any settlement or judgment is determined.

*Perdue Farms, Inc. v. Travelers Cas. and Sur. Co. of Am.*, 448 F.3d 252, 257–60 (4th Cir. 2006) (internal quotations and citations omitted) (emphasis in original).

The parties' insurance contract reads, in pertinent part:

> SUBJECT TO THE EXCLUSIONS FROM COVERAGE, THE EXCEPTIONS FROM COVERAGE CONTAINED IN SCHEDULE B, AND THE CONDITIONS, WFG NATIONAL TITLE INSURANCE COMPANY, a South

Carolina corporation (the "Company") insures as of Date of Policy and, to the extent stated in Covered Risks 11, 13, and 14 , after Date of Policy, against loss or damage, not exceeding the Amount of Insurance, sustained or incurred by the Insured by reason of:

1. Title being vested other than as stated in Schedule A.

2. Any defect in or lien or encumbrance on the Title. This Covered Risk includes but is not limited to insurance against loss from
      (a) A defect in the Title caused by
      (i) forgery, fraud, undue influence, duress, incompetency, incapacity, or impersonation;
      (ii) failure of any person or Entity to have authorized a transfer or conveyance;
      (iii) a document affecting Title not properly created, executed, witnessed, sealed, acknowledged, notarized, or delivered;
. . .
3. Unmarketable Title.
. . .
9. The invalidity or unenforceability of the lien of the Insured Mortgage upon the Title. This Covered Risk includes but is not limited to insurance against loss from any of the following impairing the lien of the Insured Mortgage
      (a) forgery, fraud, undue influence, duress, incompetency, incapacity, or impersonation;
      (b) failure of any person or Entity to have authorized a transfer or conveyance;
. . .
10. The lack of priority of the lien of the Insured Mortgage upon the Title over any other lien or encumbrance.

(ECF No. 1-4 at 2, 8).  Schedule A clarifies that Plaintiff is the insured party, that the insurance contract covers title to the Property as vested in N&A Kitchen, LLC, and that the insured mortgage under the policy is the mortgage made by N&A Kitchen, LLC to Plaintiff in the amount of $210,000.  *Id.* at 3.  The contract further provides under Conditions:

**5. DEFENSE AND PROSECUTION OF ACTIONS**

(a) Upon written request by the Insured, and subject to the options contained in Section 7 of these Conditions, the Company, at its own cost and without unreasonable delay, shall provide for the defense of an Insured in litigation in which any third party asserts a claim covered by this policy adverse to the Insured. This obligation is limited to only those stated causes of action alleging matters insured against by this policy. The Company shall have the right to select counsel of its

18

> choice (subject to the right of the Insured to object for reasonable cause) to represent the Insured as to those stated causes of action. It shall not be liable for and will not pay the fees of any other counsel. The Company will not pay any fees, costs, or expenses incurred by the Insured in the defense of those causes of action that allege matters not insured against by this policy.

*Id.* at 11.[7] Finally, under the Exclusions from Coverage section, the policy mandates that

> The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:
> . . .
> 3. Defects, liens, encumbrances, adverse claims, or other matters
> (a) created, suffered, assumed, or agreed to by the Insured Claimant . . . [or]
> (e) resulting in no loss or damage to the Insured Claimant.

*Id.* at 9.

There is no genuine dispute of material fact that Defendant had a duty to defend Plaintiff in Al-Sabah's second lawsuit under the above contractual terms. *See Utica Mut. Ins. Co. v. Miller*, 130 Md. App. 373, 380 (2000) ("In the instant case, the parties do not dispute the terms of the insurance contract, but disagree as to the proper interpretation of the contract. Thus, because appellant's duty to defend rests on the construction and interpretation of the contract, resolution by summary judgment is appropriate."). As a preliminary matter, the Court notes that much of Defendant's opposition to the Motion for Summary Judgment articulates, cites, and bases its arguments on law regarding an insurer's duty of *indemnification* rather than an insurer's duty to defend.

But with respect to Plaintiff's request for summary judgment on the duty to defend, Defendant argues that no such duty existed because (1) Al-Sabah's second lawsuit asserted tort-based claims against Plaintiff rather than a claim against Plaintiff's title to the Property and thus

---

[7] Section 7 of the Conditions states that, in the case of a claim under the policy, Defendant has the option to either (1) pay or tender payment of the amount of insurance or to purchase the indebtedness; or (2) pay or otherwise settle with parties other than the insured or with the insured claimant. (ECF No. 1-4 at 12).

Al-Sabah's second lawsuit did not assert a claim covered by the policy; (2) even if Al-Sabah presented a title-based claim regarding the Property, that claim failed because Plaintiff still retains title to the Property and has a priority interest in the Property since Plaintiff purchased the Property at a ratified foreclosure sale; and (3) exclusion 3(a) precludes Plaintiff from seeking a defense from Defendant regarding Al-Sabah's second lawsuit.

Defendant's first argument is directly contradicted by the pleadings in Al-Sabah's second lawsuit. Al-Sabah's second lawsuit was sufficient to trigger the "potentiality rule," and Defendant was thus required to provide a defense. *See Back Creek*, 213 Md. App. at 712 ("[A]n insurer's duty to defend is based on whether the allegations in the complaint *potentially* bring the claim within the policy's coverage . . . even where the action against the insured is frivolous."). For instance, Defendant argues that the underlying lawsuit "did not present a threat to [Plaintiff's] status of title or the priority of the lien" in arguing that there was no loss to the title itself, and therefore there was no coverage under the policy. (ECF No. 23-1 at 15); *see also* (ECF No. 23-1 at 12) ("The claims in the underlying litigation did not bring Sharestates' insurance claim within the coverage of the title policy, as there was never a threat to Sharestates' priority lien interest."). But Al-Sabah's second lawsuit expressly alleged that she was the equitable owner of the property (Counts V–VIII) and that Plaintiff's lien on the Property should be stripped or otherwise invalidated (Counts VI, VIII). *See* (ECF No. 23, Ex. B); *Al-Sabah v. World Bus. Lenders, LLC*, No. 18-cv-02958-SAG, ECF No. 1 at 44–45. Seeking a declaration that Plaintiff had no interest in or lien on the Property qualifies as an adverse claim to Plaintiff's interest in the Property for which the insurance policy could potentially cover. Defendant's additional argument that "there is a duty to defend *only* those claims which fall under the policy's coverage in the first place" is not entirely accurate, as Maryland courts have repeatedly held that the duty to defend is also

triggered when claims may *potentially* fall under a policy's coverage.  (ECF No. 23-1 at 22) (emphasis added).

Defendant's second argument is likewise unpersuasive because it hinges on the merits of Al-Sabah's second lawsuit rather than whether Al-Sabah's second lawsuit presented a potentially covered claim from the outset.  *See Back Creek*, 213 Md. App. at 714 ("[T]he facts ultimately proven in the . . . underlying suit have no bearing on [the insurer's] duty to defend under the title insurance policies.  Rather, an insurer's duty to defend is based on whether the allegations in the complaint potentially bring the claim within the policy's coverage . . . ."); *Perdue Farms*, 448 F.3d at 257.[8]  Put simply, Defendant cannot genuinely dispute that the insurance policy covers attacks on the Property's title so as to alter the vesting of title as described therein, or that Al-Sabah did, in fact, challenge the vesting of title to the Property by seeking a judicial determination that Plaintiff's interest in the title and lien on the Property was invalid and unenforceable.

Relying on exclusion 3(a), Defendant further argues that "The only allegations made against Sharestates [in Al-Sabah's second lawsuit] are that it created its own situation by way of mortgage fraud," and that "A loss not insured by this policy is one caused by the insured's own fraudulent acts."  (ECF No. 23-1 at 14, 26).  Under the "potentiality rule," Al-Sabah's second lawsuit still had the potential to trigger Defendant's defense obligations because Al-Sabah had not proven at that point that Plaintiff did, in fact, create any losses to its interest in the Property possibly covered by the policy.  Substantively, this Court granted Plaintiff's motion for summary judgment in Al-Sabah's second lawsuit on April 1, 2022, and found that Plaintiff had not engaged in the civil conspiracy, fraud by omission, constructive fraud, and negligence alleged by Al-Sabah in

---

[8] The same conclusion applies to Defendant's argument regarding the successful foreclosure of the Property and res judicata.  *See* (ECF No. 23-1 at 24–25).

connection with her underlying lawsuits before terminating Plaintiff as a party to that lawsuit the same day.  (ECF No. 1-10); *Al-Sabah v. World Bus. Lenders, LLC*, No. 18-cv-02958-SAG.

The parties argue at length whether the United States District Court for the Western District of Wisconsin's analysis in *Badger Mining Corp. v. First American Title Insurance Co.* supports Plaintiff's entitlement to summary judgment on the duty to defend issue.  534 F. Supp. 3d 1011 (W.D. Wis. 2021).  The Court finds that it does.  In that case, Badger, a Wisconsin based mining company, purchased property known as Goose Landing from Northern Frac Proppants II, LLC ("NFP II").  *Id.* at 1015.  Badger then purchased title insurance from First American Title Insurance Company ("First American") in connection with its purchase of Goose Landing.  *Id.*  The title insurance policy analyzed by that court was identical to that involved in the case *sub judice*.  *Id.* at 1015–16.[9]  But unbeknownst to Badger, NFP II had allegedly improperly converted the assets of Northern Frac Proppants, LLC ("NFP")—a separate entity from NFP II but CEO-ed by the same individual—to NFP II, and a group of plaintiffs filed an underlying lawsuit alleging that Goose Landing was rightfully owned by NFP rather than NFP II.  *Id.* at 1016.  Those underlying plaintiffs did *not* allege that Badger had any involvement with the allegedly improper assignment or transfer of interests in the property from NFP to NFP II.  *Id.*  However, the underlying plaintiffs did allege, similar to the case *sub judice*, that Badger engaged in a conspiracy, was disgorged by assisting, aiding, and abetting NFP II's allegedly fraudulent conduct, and that a constructive trust was proper based on the same.  *Id.* at 1017.

---

[9] Defendant acknowledges in its Motion to Dismiss/opposition to the Motion for Summary Judgment that "A title insurance policy contains several sections that must be read and interpreted comprehensively.  These include Covered Risks, Conditions, Exceptions, and Exclusions.  Title insurance policies are generated by the American Land Title Association *and are used across the country for consistent interpretation*."  (ECF No. 23-1 at 13 n.2) (emphasis added).

Also similar to the facts of this case, First American refused to defend Badger in the underlying lawsuit. *Id.* at 1018.  Badger then proceeded to defend itself and eventually filed suit against First American seeking recovery of the attorneys' fees and costs for the defense of the underlying litigation. *Id.*  First American similarly argued in that ensuing lawsuit that the same policy exclusion precluded Badger's recovery. *Id.* at 1023–24.  In rejecting that argument and ultimately finding that First American owed a duty to defend Badger, the court noted that the causes of action concerning NFP II's fraudulent transfer of NFP's assets did not rely on assertions that the underlying fraudulent activity was agreed to, supported by, or involving Badger. *Id.* at 1024.  Thus, the court determined that First American was obligated to defend against those claims that did not include Badger's alleged complicity or participation in the underlying fraudulent activity. *Id.* at 1025.  This is similar to the facts of this case, as Al-Sabah's second lawsuit did not allege that Plaintiff engaged in any fraudulent conduct or otherwise assisted N&A Kitchen, LLC or Agbodjogbe's in defrauding Al-Sabah in the first instance.  In other words, Al-Sabah's second lawsuit did not allege that Plaintiff caused the fraudulent transaction involving the initial change in title to the Property.  Al-Sabah's second lawsuit claimed that Plaintiff improperly issued the mortgage to N&A Kitchen, LLC, but Al-Sabah's adverse claim against N&A Kitchen, LLC's title in the Property—and consequently Plaintiff's priority lien interest in the Property via the mortgage—stemmed from N&A Kitchen, LLC and Agbodjogbe's underlying fraud from the first lawsuit.  Thus, the Court concludes that Defendant owed a duty to Plaintiff to defend Plaintiff in Al-Sabah's second lawsuit and *lis pendens* at least with regard to Counts V through VIII until the Court terminated Plaintiff's involvement in that case, and the Court will grant partial summary judgment in favor of Plaintiff on this issue.

A genuine dispute of material fact does exist, however, as to the exact damages/losses suffered by Plaintiff resulting from Defendant's refusal to defend.  "The 'damages for breach of the contractual duty to defend are . . . the insured's expenses, including attorney fees, in defending the underlying tort action, as well as the insured's expenses and attorney fees in a separate contract or declaratory judgment action . . . to establish that there exists a duty to defend.'"  *Selective Way Ins. Co. v. Nationwide Prop. & Cas. Ins. Co.*, 242 Md. App. 688, 711, *aff'd*, 473 Md. 178 (2021) (quoting *Mesmer*, 353 Md. at 264).  Plaintiff requests "an order directing [Defendant] to reimburse [Plaintiff] for all defense costs it has incurred in its defense of the Underlying Action and relating to the Baltimore Property," and indicates in its Complaint that such costs total at least $120,159.80. (ECF No. 19-1 at 10; ECF No. 1 at 12).  In opposing this request for damages, Defendant indicates that Plaintiff was represented by Thomas Valkenet, an attorney "well-known to the Maryland title industry" and presumably paid by some other title insurance company, who served as co-counsel with Plaintiff's own hired attorney, William Rudow.  *See* (ECF No. 23-1 at 29–30).  Defendant also highlights that Plaintiff makes no claim that it paid any of Mr. Valkenet's legal fees and thus there remains ambiguity as to what costs Plaintiff actually incurred in defending Al-Sabah's second lawsuit.  *Id.*  Plaintiff does not argue contrary to either assertion in its reply.  *See generally* (ECF No. 26-1).  Accordingly, the Court finds that there exists a genuine dispute of material fact as to the amount of damages Plaintiff incurred through defending Al-Sabah's second lawsuit such that Plaintiff is not permitted double recovery in this action.

## IV.     CONCLUSION

For the foregoing reasons, it is this 5th day of December, 2023, hereby ORDERED that:

1.  Defendant's Motion to Strike (ECF No. 22) is GRANTED in part and DENIED in part;

2.  Defendant's Motion to Dismiss (ECF No. 23) is GRANTED in part and DENIED in part; and

3.  Plaintiff's Motion for Summary Judgment (ECF No. 19) is GRANTED in part and DENIED in part.  A separate Order follows.

Date: <u>December 5, 2023</u>

<u>                     /s/                     </u>

J. Mark Coulson
United States Magistrate Judge

25